NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12291

ANDREW SEGAL  vs.  GENITRIX, LLC, & others.[1]


Suffolk.     September 5, 2017. - December 28, 2017.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Massachusetts Wage Act.  Limited Liability Company.  Agency,
    What constitutes.  Practice, Civil, Instructions to jury.



Civil action commenced in the Superior Court Department on
February 23, 2009.

The case was tried before Paul D. Wilson, J., and a motion
for a new trial was heard by him.

The Supreme Judicial Court granted an application for
direct appellate review.


Thomas H. Dupree, Jr. (Matthew S. Rozen, of the District of
Columbia, Peter M. Durney, & Julianne C. Fitzpatrick also
present) for H. Fisk Johnson, III, & another.
Timothy J. Wilton (Kathy Jo Cook also present) for the
plaintiff.
Jonathan A. Karon, Thomas R. Murphy, Matthew J. Fogelman, &
Danielle Jurema Lederman, for Massachusetts Academy of Trial
Attorneys, amicus curiae, submitted a brief.

---

[1] H. Fisk Johnson, III; Stephen Rose; William Freund; Fisk
Ventures, LLC (Fisk); Jeffrey D. Pellegrom; Metalox, LLC; and
Johnson Keland Management, Inc., The Family Office.

Ben Robbins & Martin J. Newhouse, for New England Legal Foundation, amicus curiae, submitted a brief.

KAFKER, J.  A jury found the defendants, H. Fisk Johnson, III, and Stephen Rose, two former board members and investors in Genitrix, LLC (Genitrix or company), personally liable under G. L. c. 149, § 148 (Wage Act), for failing to pay wages owed to the former president of Genitrix, Andrew Segal. The defendants moved for judgment notwithstanding the verdict and a new trial.  Both motions were denied, and the defendants appealed.  We granted the defendants' application for direct appellate review and conclude that the Wage Act does not impose personal liability on board members, acting only in their capacity as board members, or investors engaged in ordinary investment activity.  Rather, to impose such liability, the statute requires that the defendants be "officers or agents having the management" of a company.  G. L. c. 149, § 148.  The defendants were not designated as company officers and had limited agency authority.  Indeed, the only officer having the management of the company was the plaintiff, not the defendants. We therefore conclude that there was insufficient evidence to satisfy the statutory requirements and reverse the denial of the motion for judgment notwithstanding the verdict.[2]

---

[2] We acknowledge the amicus brief submitted by the Massachusetts Academy of Trial Attorneys, in support of the

1.  Background.  Because the defendants contend that the trial judge erred in denying their motion for judgment notwithstanding the verdict, we construe the facts in the light most favorable to the plaintiff.  See O'Brien v. Pearson, 449 Mass. 377, 383 (2007).  In 1997, representatives for Johnson contacted Segal about investing in Segal's cancer research. Segal and Johnson agreed to form a biotechnology startup company with Segal serving as president and chief executive officer (CEO) and Johnson providing initial funding.  Stephen Rose was a representative for Johnson, and spoke to Segal on Johnson's behalf during their negotiations over the formation of the company.  The company, Genitrix, was established as a Delaware limited liability company (LLC) headquartered in Boston.

Segal transferred his intellectual property rights to the company in exchange for a substantial equity interest.  Johnson also received a substantial equity interest in return for his initial investment in the company.  Segal and Johnson each had authority to appoint two board members to Genitrix's four-member board of representatives, and both could remove and replace their representatives with or without cause.  Most board decisions required a seventy-five per cent majority to pass. Johnson served on the board for only the first year of the

plaintiff, and the amicus brief submitted by the New England Legal Foundation, in support of the defendants.

company.  Rose was appointed as one of Johnson's board representatives in 1999 and remained a Johnson board member until the company's dissolution.  Johnson indicated to Segal that Segal should contact Rose about any financing issues, stating that Rose "speaks for" Johnson.

As a condition of Johnson's investment in the company, he insisted Segal sign an employment agreement with Genitrix.  The agreement provided that Segal would serve as the president and CEO of the company, with the "duties, responsibilities and authority" commensurate with those positions, such as "conducting the [c]ompany's business, research and development," and managing its "finances and other administrative matters, subject to the overall direction and authority of [its] [b]oard."  The agreement further provided that "[a]t any time after the second anniversary . . . , the [c]ompany, with the approval of at least [fifty per cent] of the [board], may replace [Segal] as chief executive officer."  If no suitable replacement CEO could be found within fifteen months who seventy-five per cent of the board could agree upon, the Johnson board members were authorized to appoint a new CEO.[3]

The employment agreement contained terms for Segal's

---

[3] In 2003, upon Fisk becoming a shareholder of Genitrix, LLC (Genitrix), board members designated by Johnson and Fisk were those authorized to appoint a new chief executive officer (CEO) pursuant to this provision.

removal as an employee that were different from the terms for his removal as CEO. Under the employment agreement, Segal's "[e]mployment [p]eriod" could be terminated in one of three ways: (1) resignation; (2) removal for cause approved by fifty per cent of the board; or (3) removal without cause approved by seventy-five per cent of the board. The agreement stated, "Upon termination of the [e]mployment [p]eriod, [Segal] shall not be entitled to receive his [b]ase [s]alary or any fringe benefits for periods after the termination of the [e]mployment [p]eriod." The agreement also specified Segal's salary for the first two years of his employment. Afterward, his salary was to be determined by a vote of seventy-five per cent of the board, and was "payable in regular installments in accordance with [Genitrix]'s general payroll practices."[4] The employment agreement identified Johnson as a third-party beneficiary, and authorized him to "enforce the [c]ompany's rights under the terms of this [a]greement." Any amendment or waiver of a provision in the employment agreement required written consent from Genitrix, Segal, and Johnson. At no point did Johnson exercise his rights, including termination rights, pursuant to this agreement.

---

[4] Andrew Segal's base salary was $75,000 per year until July, 2003. At that time, the board members of Genitrix approved a resolution to increase his salary to $150,000 per year.

In 2003, Johnson began funding Genitrix through Fisk Ventures, LLC (Fisk), an entity owned entirely by Johnson and Rose.[5] Fisk became the largest shareholder of Genitrix, and gained the authority to appoint a fifth member to the board. Thereafter, Johnson and Fisk's combined equity in Genitrix exceeded fifty per cent. Fisk and Johnson's board representatives, taken together, constituted sixty per cent of the board. Although their representatives comprised a majority on Genitrix's board, they were still short of the seventy-five per cent threshold required to pass most board resolutions.

Genitrix never employed more than five full-time employees. As the president and sole officer, Segal was responsible for all day-to-day operations. He supervised the laboratory and directly managed human resources. He was in charge of fundraising and generating new capital. Segal also handled the company's payroll. As the only individual with authority to "physically sign checks on the Genitrix bank accounts," he wrote checks for employee wages. When Genitrix began using a company called Paychex to handle its payroll, Segal still had to order each payroll individually, including for himself. However, Segal did need board approval for numerous actions, including "material personnel practices or policies," hiring and firing of

---

[5] Johnson owned over ninety per cent of Fisk, and Rose owned the remainder.

employees earning $45,000 or more, setting compensation for officers and employees other than Segal, and acquiring debt or equity in the company.

On March 23, 2006, Segal informed the board that the company was running out of funds to pay its employees.  He told the board they would need to lay off at-will employees the company could not afford to pay, so as to avoid liability under the Wage Act.  A few days later, Rose told Segal that Fisk would not invest more money in Genitrix if Segal continued to control the management of the company.[6]  Fisk did subsequently invest additional money in Genitrix on April 6, 2006, but unlike prior investments, Rose earmarked that investment for specific purposes:  payroll, expenses necessary to comply with covenants in the LLC agreement, and the repair or replacement of a centrifuge.  All subsequent Fisk investments were also earmarked for specific purposes, such as patent fees and other employees' salaries.  Segal voted in favor of each board resolution authorizing Genitrix to accept these investments.

At the start of 2007, Genitrix was still short on money and struggling to make payroll.  Segal stopped taking his salary in January, 2007.  He testified that he did so to help the company

---

[6] Segal was no longer CEO of the company after 2006. Segal's testimony does not provide an explanation for this change.  Rose testified that Segal resigned to prevent the board from reducing his board seats.

afford to pay Elihu Young, its last remaining employee other than Segal. Segal explained he "was put in a position where [he] felt [he] had to not pay [him]self." When pressed about who made that decision, Segal testified, "Given the box I was in, I did." Segal later suggested to the board that he was no longer paying himself. On February 23, 2007, he stated, "Even without disbursing my salary, it is unlikely that we will be able to pay . . . Young for more than [two] more pay periods," and proposed that the company sell its laboratory equipment and lay off Young to cut costs. Rose believed Young was "extraordinarily valuable to the company," as the only one who knew "how to make the [company's cancer-fighting] molecule." Rose responded that "given [Young's] importance to the company, he should not be let go without giving the board a full opportunity to meet and discuss this issue in detail. Liquidating assets is an important issue as well." The Johnson board members did not agree to either proposal. Instead, Rose directed Fisk to invest enough money in Genitrix to pay Young's salary for another month.

Despite Segal opting to not pay himself, by mid-2007 Genitrix was again unable to afford to pay even Young. On May 17, 2017, Johnson's board members finally agreed to lay off Young, voting in favor of a board resolution to terminate Young's employment. A week later Fisk invested additional money

in Genitrix for the purpose of paying Young's remaining salary. When Young left, Young closed the company's laboratory.

At this point the company was out of money and apparently deadlocked on even how to conduct board business. Rose and the Johnson board members wanted to hold board meetings, but Segal wanted to conduct board business using electronic mail (e-mail) messages so that everything would be in writing. As a result of the deadlock and the financial condition of the company, Rose filed a petition for the judicial dissolution of Genitrix on behalf of Fisk in June, 2007. The petition was filed in Delaware, where Genitrix was incorporated. Segal was a named party to the Delaware dissolution proceeding because he was still the president of the company.

For the next two years Segal actively opposed the dissolution. In July, 2007, he brought counterclaims in that proceeding against the defendants for breach of the LLC agreement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, and tortious interference with his employment agreement. Segal did not bring a Massachusetts Wage Act claim in those proceedings.[7]

As the dissolution proceedings continued, Segal did some other work as president, including paying patent annuity fees

---

[7] Given the result we reach here, we need not address the issue of claim preclusion.

and protecting the work associated with those patents, securing directors' and officers' insurance, and making necessary tax filings.  Segal testified that he continued to work for the company during this time, despite no longer taking a salary, because he thought he "would eventually get paid."  He believed that when the company sold its patents, "that money would go, at least in part, to pay [him]."

Both Young and Segal raised the issue of unpaid wages with the board.  A few months after Segal stopped paying himself, he informed the board that he was no longer taking a salary.  In late 2007, months after he left Genitrix, Young threatened to bring a Wage Act claim against the company for outstanding unpaid wages.  In March, 2008, Rose directed Fisk to invest enough money in Genitrix to compensate Young for his unpaid wages, and in return Young signed an agreement releasing Genitrix, its board members, and its agents from liability.  Rose did not, however, direct Fisk to invest money in Genitrix toward Segal's salary.

Segal and Rose continued to argue over whether Segal was owed wages, and whether those wages should take priority over other company expenses, such as patent fees.  On February 19, 2009, Segal sent an e-mail message to Rose stating, "The [c]ompany owes me wages and benefit expenses.  I cannot agree to any arrangement that does not respect that claim."  Rose

responded, "It is not appropriate to subordinate new funds to whatever claims that you may believe you have. . . . So, if you can't have first priority, you think that the company's intellectual property rights should simply expire?"

In early 2009, Segal filed suit against Rose and Johnson in Massachusetts under the Wage Act for unpaid wages from 2007 to 2009. Around the same time, the Delaware Court of Chancery ordered Genitrix's dissolution and appointed a liquidator to conduct the dissolution and winding up of the company's affairs. As part of the dissolution, the liquidator auctioned off Genitrix's intellectual property. Fisk submitted the winning bid of $300,000 even though Johnson's board representatives had said Genitrix was worth over $15 million three years earlier.

Segal submitted a proof of claim to the liquidator for back pay in June, 2009, but that claim was denied. Segal appealed from the denial to the chancellor, who dismissed the claim as moot in October, 2010, because the company did not have enough money to satisfy Segal's claims.

The defendants moved for summary judgment in the Massachusetts Wage Act suit, and a Superior Court judge granted the motion in 2013, finding that the defendants did not "have the management" of the company under the Wage Act. The Appeals Court, in a memorandum and order pursuant to its rule 1:28, reversed and remanded the grant of summary judgment on the Wage

Act claim, holding that our decision in Cook v. Patient Edu, LLC, 465 Mass. 548, 556 (2013), which found the manager of an LLC liable under the Wage Act, raised a genuine issue of material fact as to whether the defendants could be held liable under the Wage Act.  See Segal v. Genitrix, LLC, 86 Mass. App. Ct. 1103 (2014).

At trial the jury were instructed that the "duty to pay wages extends to the president and treasurer of a corporation and any officers or agents having the management of such corporation, which includes an LLC, such as Genitrix."  More specifically, the jury were instructed that a "person qualifies as an agent having the management of such corporation if he . . . 'controls, directs, and participates to a substantial degree in formulating and determining policy of the corporation or LLC.'"  The jury went on to find both defendants individually liable under the Wage Act.  Segal filed a timely notice of appeal, and we granted Johnson and Rose's application for direct appellate review.  On appeal, the defendants argue, inter alia, that there was insufficient evidence to find Wage Act liability and, alternatively, that the judge erred in his instructions to the jury about the Wage Act.

2.  Discussion.  a.  The statutory language and legislative history of the Wage Act.  The Wage Act requires employers to compensate their employees for earned wages as set out in G. L.

c. 149, § 148. An employer who violates § 148 may be sued by the aggrieved employees. G. L. c. 149, § 150. Section 148 defines "employer" as a "person having employees in his [or her] service." G. L. c. 149, § 148. For corporations, such persons are the "president and treasurer of [the] corporation and any officers or agents having the management of such corporation," in addition to the corporation itself. Id. The statute does not include board directors or investors in its definition of "employer." See id. As explained below, we consider the omission of directors and investors to be significant. If personal liability is to be imposed on these defendants, who served as directors and investors, it must be because they meet one of the express categories of corporate actors identified by the Legislature: the president, treasurer, or officers or agents having the management of the company. Such officers or agents have assumed and accepted individual responsibility for the management of the corporation, justifying the imposition of personal liability for Wage Act violations.

Both parties agree that neither defendant was ever president or treasurer of Genitrix. Indeed, the plaintiff in this case was president of Genitrix. The defendants were also not officers of Genitrix. Accordingly, they could only be found liable if they were "agents having the management" of Genitrix under the statute.

In determining the meaning of "agents having the management" of the company, we examine the statutory language and legislative history, as well as our case law. DiFiore v. American Airlines, Inc., 454 Mass. 486, 490-491 (2009), quoting Industrial Fin. Corp. v. State Tax Comm'n, 367 Mass. 360, 364 (1975) ("We look to the intent of the Legislature 'ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' . . . In addition, our respect for the Legislature's considered judgment dictates that we interpret the statute to be sensible, rejecting unreasonable interpretations unless the clear meaning of the language requires such an interpretation"). The plain language of the provision indicates two important requirements:  the defendant must both be an agent and have the management of the company. See G. L. c. 149, § 148; Milford v. Boyd, 434 Mass. 754, 757 (2001) ("In interpreting a statute, . . . none of its words is to be regarded as superfluous").

The language, "agents having the management of such corporation," should also be read in the context of the language it follows. DiFiore, 454 Mass. at 491 ("Where possible, we construe the various provisions of a statute in harmony with one

another, recognizing that the Legislature did not intend internal contradiction").  The statute begins with express reference to the president and treasurer, two high level officers in the corporation with individual responsibility for its over-all management, particularly its financial affairs.  See Lydia E. Pinkham Med. Co. v. Gove, 303 Mass. 1, 9 (1939) (as treasurer and assistant treasurer of company, defendants had duty to protect company's finances and disburse them as directed by president or directors).  After expressly including these two positions, it refers to officers or agents having the management of the corporation.  Not all officers or agents are included, just those, like the president or treasurer, having the management of the corporation.  Some management responsibility is not the same as "the" management of the corporation.  Wiedmann v. The Bradford Group, Inc., 444 Mass. 698, 712 (2005) ("Merely holding a managerial position over some branch, division, or office of a corporation does not, by itself, mean that that manager has the 'management' of the 'corporation' as a whole").  We therefore understand the Legislature to impose personal liability for Wage Act violations on the president and treasurer of the corporation and on other officers or agents who may not hold these titles, but who have assumed and accepted as individuals significant management responsibilities over the corporation similar to those performed by a corporate president

or treasurer, particularly in regard to the control of finances or payment of wages.

This interpretation is also supported by the legislative history.  As we discussed in Cook, 465 Mass. at 552, the Wage Act was passed in 1879, and originally applied only to municipalities employing "laborers."  See St. 1879, c. 128. Over time, the Wage Act expanded to include specific industries, until it was eventually amended to cover all private employers. See id.; St. 1935, c. 350.

In 1932, a provision was added to the Wage Act to address corporate violations of the statute, imposing personal liability on "any officer thereof responsible for such violation."  St. 1932, c. 101.  At this point the statute was confined to a select group of company officers responsible for the Wage Act violation.  Neither board members, investors, nor other corporate actors were referenced.  In 1935, the statutory language was replaced with the modern wording, which imposes liability on the "president and treasurer of a corporation and any officers or agents having the management of such corporation."  See St. 1935, c. 350.

The primary change to the wording of the corporate liability provision in 1935 was the addition of per se individual liability for a company's president and treasurer, two of the corporation's highest-level officers who had assumed

and accepted individual responsibility for the company's over-all financial management.  In addition to expressly including these two positions, the 1935 amended language refers to officers or agents of the corporation, but, as explained above, not all officers or agents were included, only those, like the president or treasurer, having "the management" of the corporation.  The reference to "officers or agents having the management" harkens back to the original wording from 1932, which imposed personal liability on the officers who were "responsible for such violation" of the Wage Act.  The particular statutory focus on the payment of wages is also evident from the purpose of the Wage Act.[8]  The Wage Act was enacted to "protect wage earners from the long-term detention of wages by unscrupulous employers."  Cook, 465 Mass. at 552, quoting Melia v. Zenhire, Inc., 462 Mass. 164, 170 (2012).

b.  The novel questions presented here.  We begin with the recognition that this case is quite unusual and removed from the

---

[8] The focus on the payment of wages is particularly clear in the language governing G. L. c. 149, § 148, violations in the public sector:

"Every public officer whose duty it is to pay money, approve, audit or verify pay rolls, or perform any other official act relative to payment of any public employees, shall be deemed to be an employer of such employees, and shall be responsible under this section for any failure to perform his official duty relative to the payment of their wages or salaries, unless he is prevented from performing the same through no fault on his part."

core concerns of the Wage Act.  An employee may always sue the president and treasurer of a company for unpaid wages.  The Wage Act imposes categorical liability on a company's president and treasurer, and under Massachusetts law, corporations are required to elect a president and treasurer.  G. L. c. 149, § 148.  G. L. c. 156D, § 2.05.  The plaintiff here, however, is the president and sole officer of the corporation and thus the only person expressly identified by virtue of his title as responsible for Wage Act violations.  He was also specifically and exclusively charged with the management of the finances and the payroll function in his employment agreement.  He also made the decision not to pay himself.  As we consider whether the defendants were agents having the management of the company for the purposes of imposing personal liability under the Wage Act, we must carefully separate Segal's officer and agency powers, and his actions, from those of the defendants.

We must also for the first time apply the definition of "agents having the management of the corporation" to board members or investors.  None of our previous cases involved attempts to impose liability on board members or investors.  Nor did any of those cases require us to define the term "agent." In Wiedmann, 444 Mass. at 711, liability was imposed on the president of the company and another individual who the defendants "admit[ted] ran the company."  However, with regard

to a third individual who was a manager in the company, we held that he lacked "the" management of the corporation as a whole, as he was not a higher-level executive, that is "someone who controls, directs, and participates to a substantial degree in formulating and determining policy of a corporation."  Id. at 711-712.  Thus, in Wiedmann we only had to focus on the management part of the test of "agents having the management of such company."  In Cook, 465 Mass. at 554, we had an even narrower question to answer, which was whether LLCs should be treated the same as other corporations for Wage Act purposes. We concluded they should, and reversed the allowance of a motion to dismiss based on the corporate structure of the LLC.  Id. at 556.

How the statutory definition of "agents having the management of such corporation" would apply to board members and investors is by no means obvious.  A board generally acts collectively, not individually.  Estate of Moulton v. Puopolo, 467 Mass. 478, 487-488 (2014).  Also a board ordinarily sets policy and oversees management but does not perform the management function itself.  See Boston Athletic Ass'n v. International Marathons, Inc., 392 Mass. 356, 365 (1984).  See also Harhen v. Brown, 431 Mass. 838, 844 (2000).  Investors may exercise significant financial control over a company through their power over their investments, but they are generally

acting as outsiders, not managers or agents of the corporation. With these overarching considerations in mind, we turn to the application of the phrase "agents having the management" of the company to board members and investors in general and, more specifically, Johnson and Rose.

    c.  <u>Requirement that the defendants be agents</u>.  Section 148 does not define "agent," but we assume the Legislature intended to give the term its ordinary common and corporate law meaning. See <u>Goodrow</u> v. <u>Lane Bryant, Inc</u>., 432 Mass. 165, 170 (2000).  At common law, an agency relationship exists where "there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control."  <u>Theos & Sons, Inc</u>. v. <u>Mack Trucks, Inc</u>., 431 Mass. 736, 742 (2000).  See <u>Fergus</u> v. <u>Ross</u>, 477 Mass. 563, 566 (2017); Restatement (Second) of Agency § 15 (1958).  In the context of corporate law, an executive officer is generally considered an agent of the company, because he or she acts on the corporation's behalf, subject to the corporation's control, as exercised through the board of directors.  See Restatement (Second) of Agency § 14C comments a, b (1958).  By contrast, "[n]either the board of directors nor an individual director . . . is, as such, an agent of the corporation."  <u>Id</u>. at § 14C. This is because the board of directors, acting as a whole, is generally not subject to another's control.  <u>Id</u>. at § 14C

comment a.  "An individual director, as such, has still less resemblance to an agent than has the board as a body.  He [or she] has no power of his [or her] own to act on the corporation's behalf, but only as one of the body of directors acting as a board.  Even when he [or she] acts as a member of the board, he [or she] does not act as an agent, but as one of the group which supervises the activities of the corporation."  Id. at § 14C comment b.[9]  See Estate of Moulton, 467 Mass. at 487.

Likewise, investors in a company are ordinarily not considered agents of the company.  Much like board members, investors invariably exercise some control over the businesses they invest in.  See United States v. Bestfoods, 524 U.S. 51, 72 (1998).  However, exercising one's rights as an outside investor is separate and distinct from being an agent of the corporation.  1 W.M. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 30, at 100 (rev. ed. 2015) ("The mere fact that one is a shareholder or a majority or principal shareholder gives the individual no authority to represent the corporation as its agent in dealing with third persons" [footnote omitted]).

---

[9] The Restatement (Second) of Agency § 14C (1958) is more on point in these circumstances than Restatement (Third) of Agency § 1.01 comment f(2) (2006).  This court has also recently relied on the Restatement (Second) of Agency in Estate of Moulton v. Puopolo, 467 Mass. 478, 487 (2014).

Investors are acting on their own behalf, not that of the company.  Neither the common understanding of the word "agent," nor its use in the Wage Act, encompasses ordinary investors or investment activity.  This court accordingly will not attribute to the Legislature an intent to "alter the normal rules of corporate law . . . in the absence of plain or necessarily implied intent to change the pre-existing law."  Leonard v. McMorris, 63 P.3d 323, 327 (Colo. 2003).  See Scott v. NG US 1, Inc., 450 Mass. 760, 769 n.16 (2008) (reading legislative intent in G. L. c. 21E to avoid "doing violence to bedrock principles of corporate law").  If the Legislature intended for the Wage Act to reach investors and investment activity, it would have done so explicitly.  See Seagram Distillers Co. v. Alcoholic Beverages Control Comm'n, 401 Mass. 713, 720 & n.11 (1988) (declining to disregard corporate form where statute did not clearly mandate it).

This is not to say that an individual director or investor can never be personally liable as an agent of the company. Rather, individual directors or investors may still be considered agents of the corporation if they are empowered to act as such, but any agency relationship stems from their appointment as an agent, not from their position as a director or investor.  Restatement (Second) of Agency at § 14C comment b. For example, an individual director or investor could be

appointed as an agent if the board exercised "its express or implied power to confer authority upon [the individual] to act for the corporation," or if the individual was appointed as an executive officer. Id. This does not mean that an individual director is immune from any Wage Act liability unless the board has passed an official board resolution appointing that director as an agent of the company. An agency relationship can arise from either express or implied consent. Theos & Sons, Inc., 431 Mass. at 742. If, for example, a particular board member had been empowered to act individually as the functional equivalent of the president or treasurer of the corporation, that board member would be liable for Wage Act violations. Cf. Estate of Moulton, 467 Mass. at 489 ("There is no allegation that the directors undertook any action without a formal board meeting or vote, nor is there any allegation that any individual director attempted to usurp the power of the board . . .").

In the instant case, neither defendant was appointed as an executive officer. The LLC agreement provided that "[u]nless delegated by the [b]oard, all management powers over the business and affairs of the [c]ompany shall be exclusively vested in the [b]oard." Those management powers, particularly over the payment of wages, were in turn expressly delegated to Segal, not individual board members. The agreement also expressly stated that investors did not have agency authority.

The agreement specified that "[n]o [m]ember in his or her capacity as a [m]ember shall have any power to represent, act for, sign for or bind the [c]ompany or make any expenditures on behalf of the [c]ompany."[10]

There was, however, one express delegation of power to the defendants. The employment agreement between Segal and Genitrix named Johnson, as the investor, as a third-party beneficiary. It expressly stated that Johnson "may enforce the [c]ompany's rights under the terms of this [a]greement." Thus, Johnson was empowered to act as Genitrix's agent to enforce Segal's employment agreement, including the termination provision which allowed the "[b]oard with the approval of at least [fifty per cent] of the [r]epresentatives" to terminate Segal's employment for cause. Additionally, Johnson's e-mail message to Segal stating that Rose "speaks for" Johnson, and Segal's testimony that Johnson was referring to financial matters, allows for a reasonable inference that Rose was Johnson's agent. Whatever agency powers Johnson had, Rose essentially shared.

In sum, Segal, the president and the only officer of the

---

[10] The limited liability company (LLC) agreement defined "[m]embers" as "Segal, [i]nvestor [Johnson], the [o]ther [i]nvestors and any [p]erson who becomes a substituted or additional [m]ember as herein provided and who is listed as a member of the [c]ompany in the books and records of the [c]ompany, in such [p]erson's capacity as a member of the [c]ompany."

company, had significant officer and agency authority. In contrast, the defendants had limited express agency authority, all of which related to the power to terminate Segal.

d. <u>Requirement that the defendants have the management of the company</u>. The question then becomes whether the defendants' limited agency powers, analyzed in the context of the over-all corporate structure, made either or both defendants agents having the management of the company. We conclude that the agency authority here was insufficient to make the defendants individually or collectively "agents having the management of such corporation."

i. <u>Johnson's authority to enforce the employment agreement</u>. As the sole officer of Genitrix, specifically charged with "management of the [c]ompany's . . . finances and other administrative matters," including the human resources and payroll functions, Segal, not the defendants, had all of the express officer and agent authority over the management of Genitrix.

During most of this time period, Segal was not only the sole executive but also the only employee; he was also the only individual with authority to sign checks on behalf of the company, and he was exclusively in charge of payroll. The defendants had no agency authority in this area. Segal testified that he affirmatively decided to stop paying himself

due to lack of funds. When asked at trial who instructed the payroll company, Paychex, to stop paying him, Segal testified, "Well, I didn't tell them not to pay me. I just didn't tell them to pay me." The decision was not made by Johnson or Rose, as they were not empowered to do so.

In contrast to Segal's wide-ranging powers over management as the sole officer of the company and its designated authority for payroll, Johnson's management powers as an agent derived only from his authority to "enforce the [c]ompany's rights under the terms" of Segal's employment agreement. The right to fire Segal for cause, and select his successor if no suitable person satisfactory to seventy-five per cent of the board could be identified in fifteen months, does not, by itself, render Johnson an agent having the management of the corporation. This right gave Johnson some leverage over Segal, but not the over-all management of the financial and payroll function of the company as required by the Wage Act.

The other significant powers the defendants had as board members and investors were distinct from the agency powers provided in the agreement. As explained above, the board's powers are neither agency powers nor powers entrusted to individual board members. Collective board oversight and control over management, finances, and policy is not oversight and control by individual board members. See Estate of Moulton,

467 Mass. at 487 ("Adoption of corporate policies is achieved by a vote of the board of directors as whole, acting as the corporation . . . and cannot be accomplished in the ordinary course by any individual director").  The individual board members are not acting as the board's agents in the exercise of this board function.  The statute specifically imposes personal liability on those who have assumed individual responsibility as officers or agents.  It does not impose individual liability on board members, acting as board members, or outside investors overseeing their investments.  This distinction reflects the Legislature's intention to exclude the ordinary performance of board or investor responsibilities, including board or investor oversight of management and the policymaking and financial controls associated therewith, from personal liability under the Wage Act.  Personal liability, particularly for board members, in corporate law is the exception, not the rule.  See G. L. c. 156D, § 8.30 (c) ("A director is not liable for any action taken as a director, or any failure to take any action, if [the director] performed the duties of his [or her] office in compliance with this section").  See also Sagalyn v. Meekins, Packard & Wheat Inc., 290 Mass. 434, 438 (1935) ("The management of the corporation is vested commonly in the board of directors. Their action taken in good faith, even though wanting in sound judgment, does not involve them in personal liability").  The

individuals targeted by the Wage Act reflect this careful consideration by the Legislature, particularly given that violations of its provisions may give rise to criminal as well as civil liability.  G. L. c. 149, § 150 (authorizing "indictment against any person for a violation of [§] 148").

Finally, our corporate statutes as a matter of course impose management oversight responsibility on boards.  See, e.g., G. L. c. 156D, § 8.01 (b):  "All corporate power shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, its board of directors, subject to any limitation set forth in the articles of organization . . . ."  Therefore, if board members, acting as board members, were to be considered agents of the company and their normal oversight responsibility were deemed to be "the management of the company," then they would always be agents having the management of the company.  If that were the case, the Legislature would not have omitted board members and directors from the definition of corporate employers, as they would essentially have per se liability for every Wage Act violation.

ii.  Rose and Johnson's particular board activities.  At trial, Segal pointed to the behavior of Rose and Johnson's other board representatives, as well as Rose's communications on behalf of Johnson's representatives, as evidence of the

defendants acting as agents having the management of the company.  In particular, he emphasized that Rose and the other Johnson board representatives refused to authorize Segal's cost-cutting proposal to terminate the last employee other than Segal and to sell the company's laboratory equipment.  This decision, according to Segal, limited Genitrix's ability to pay Segal.

As evidenced by Rose's response to Segal, the termination of the only employee who knew how to make the company's molecule and the sale of the company's laboratory equipment were not the type of ordinary personnel or financial decisions left to individual managers.  They obviously rose to the level of board consideration.  That being said, corporate boards are regularly required to make difficult decisions that have an impact on the company's finances; indeed, that is an important part of their responsibility as a board.  Such decisions, however, are not the acts of individual board members as agents and do not impose personal Wage Act liability.[11]  We discern nothing exceptional in these board activities that would render Rose or Johnson individually liable under the Wage Act as agents having the

---

[11] We note that even within the regular confines of board activity, Rose could not control the board.  To the contrary, the board was deadlocked.  The Johnson board representatives constituted sixty per cent of the board, short of the seventy-five per cent majority required to pass most board resolutions. Segal and his other representative constituted the remaining forty per cent.

management of the corporation.  See Estate of Moulton, 467 Mass. at 489.

iii.  Rose's investment activities.  To prove that Rose acted as an agent having the management of Genitrix, Segal relied heavily on the conditions Rose imposed on new infusions of capital by Fisk.  In 2006, as Genitrix was running out of funds, Segal sought more money from Fisk.  Rose informed Segal that Fisk would not invest more money in Genitrix if Segal remained in control.  Thereafter, Rose restricted Fisk's new investments to fund specific expenses, as decided by Rose.  By 2007, Genitrix was so financially strapped that it needed more outside investment to fund its existing operations, including payroll.  It was during this time period that Segal worked without pay.

As explained above, investors invariably exercise some control over the businesses in which they invest, particularly when that business is failing and seeking new funds from these investors.  See Bestfoods, 524 U.S. at 72 (activities consistent with investor status include monitoring corporation's performance and supervising corporation's finance and capital budget decisions).  But exercising one's rights and leverage as an investor over infusions of new money are separate and distinct from being an agent having the management of the corporation that is seeking the additional financing.

Investment restrictions limited to the use of new monies are not management direction and control over existing resources. See generally Scott, 450 Mass. at 766.

Fisk was a separate company from Genitrix. Fisk was not responsible for Genitrix's payroll; Genitrix was. Fisk had no contractual or other obligations to make these payments. As Fisk's representative, Rose undoubtedly had significant power over new investments in Genitrix, and how that money was spent, but his exercise of that power was not as an agent having the management of Genitrix. In fact, the LLC Agreement expressly prohibited the defendants from exercising agency authority on behalf of the company in their role as investors. It was Segal, not Rose, acting as the agent of Genitrix in these negotiations for infusions of new money from Fisk. Segal, as a board member, also voted in favor of each board resolution to accept capital from Fisk, including the conditions imposed on those monies. Finally, Rose imposing terms and conditions on new outside investment is not the same as Rose managing the company. We therefore conclude that Rose's actions conditioning Fisk's infusions of new capital into Genitrix do not prove he was an agent having the management of Genitrix.[12]

---

[12] No arguments have been made on appeal raising questions whether Rose's twin roles as a Fisk investor and Genitrix board member presented issues regarding his exercise of his fiduciary duty of loyalty or care to Genitrix. Furthermore, at least

In sum, neither board members nor investors are officers or agents having the management of the company for Wage Act purposes unless they are so empowered by the corporation. Here, the person expressly designated as an officer or agent of Genitrix, particularly in regard to the payment of wages, was the plaintiff, Segal, not the defendants Rose or Johnson. In this context, neither Rose's ordinary board activities on behalf of Genitrix, his investment activities on behalf of Fisk, nor his actions as Johnson's agent, alone or in combination, rendered either him or Johnson personally liable for any Wage Act violations as agents having the management of Genitrix. Accordingly, we conclude that the evidence at trial was insufficient to establish the defendants as liable under the Wage Act, and the trial judge erroneously denied the defendants'

---

under Delaware law, LLCs may limit fiduciary duties. Del. Code Ann. tit. 6, § 18-1101(c) ("To the extent that . . . a member or manager or other person has duties [including fiduciary duties] to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . ."). As the Delaware Court of Chancery judge explained, "the Genitrix LLC [a]greement eliminates fiduciary duties to the maximum extent permitted by law by flatly stating that members have no duties other than those expressly articulated in the [a]greement. Because the [a]greement does not expressly articulate fiduciary obligations, they are eliminated." We also note that it is not at all uncommon for investors to have seats on the boards of the companies in which they invest. Indeed, they often insist on it.

motion for judgment notwithstanding the verdict.

e. Jury instructions. The defendants also advance a number of other arguments relating to the trial judge's denial of their motion for a new trial. We need not address these arguments in light of our conclusion that the judge erred in denying the defendants' motion for judgment notwithstanding the verdict.[13] However, given our analysis above, and the need for clarity in future cases, we address whether the jury instructions were appropriate as to the meaning of "agents having the management of such corporation" under the Wage Act. We conclude that they were not.

At trial, the jury were not instructed on agency, except insofar as it related to the question whether Rose acted as Johnson's agent. Instead, jurors were instructed that "a person qualifies as an agent having the management of such corporation if he . . . 'controls, directs, and participates to a substantial degree in formulating and determining policy of the corporation or LLC.'" The trial judge erred in giving this instruction, as the language was taken out of context from our prior cases and causes confusion, particularly when the defendants are board members and investors. See Cook, 465 Mass. at 556; Wiedmann, 444 Mass. at 711.

---

[13] We note in particular that the briefing and record are incomplete on the complicated issue of claim preclusion.

In Wiedmann, supra, as explained above, the defendants were a company's president and treasurer, another individual who admitted to running the company, and the general manager of an office. The language quoted from the Wage Act was used to determine whether an office manager satisfied the requirement of "having the management" of the company. Id. We were not tasked with differentiating the authority of board members or investors, or defining the contours of agency. Indeed the agency status of the manager in Wiedmann was not at issue, just the extent of his management powers. The issue of agency was also not raised in Cook, supra; the only pertinent question there was whether the Wage Act could impose personal liability in the context of an LLC. The agency issues and the potential liability of board members and investors were, however, presented in the instant case and required more complete jury instructions.

The defendants made a motion in limine requesting three instructions on agency, all of which were denied. First, they sought an instruction that "agents having the management of such corporation" referred to agents who do not hold the formal title of president or treasurer, but whose actual responsibilities are functionally equivalent to those of a corporate president or treasurer. Second, they requested an instruction defining how an agency relationship is created. Third, they asked for an

instruction that outside board directors who are not officers or employees of the company are not agents unless specifically appointed as such.

We believe instructions clarifying these distinctions were required in the instant case to avoid confusion about the difference between the powers and responsibilities of board members, investors, and "agents having the management of such corporation."  The jury should have been instructed that there are two important requirements to being an officer or agent having the management of the company.  The defendant must be an agent or officer, and must have the management of the company. To further define the meaning of "officers or agents having the management" of the company, the jury should have been instructed that the Wage Act imposes liability on the president and treasurer of the corporation and on other officers or agents who may not hold these titles but whose significant management responsibilities over the corporation are similar to those performed by a corporate president or treasurer, particularly in regard to the control of finances or the payment of wages.  This instruction, and not the language from Wiedmann, 444 Mass. at 711, should be given, as it properly defines the meaning of "officers or agents having the management" of the company and avoids confusing a manager's responsibilities with management oversight by a board or financial control over investments by an

outside investor.

In cases involving Wage Act claims against board members, the jury should also be instructed that "[n]either the board of directors nor an individual director . . . is, as such, an agent of the corporation." Restatement (Second) of Agency § 14C. An individual director may become an agent if he or she is also appointed as an agent, but no agency relationship arises from his or her position as a director, in and of itself. Id. at § 14C comment b. For example, an individual director could be appointed as an agent if the board exercised "its express or implied power to confer authority upon [the individual] to act for the corporation," or if the individual was appointed as an executive officer. Id. Additionally, the jury should be instructed that the collective powers of the board to control management or set policy are separate and distinct from the powers of individual board members. See Estate of Moulton, 467 Mass. at 487.

In cases involving Wage Act claims against investors, the jury should be instructed that an outside investor, acting in his or her capacity as an investor, is not an agent of the company. See 1 W.M. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 30, at 100. An outside investor may become an agent, if the board, exercising its express or implied powers, confers authority upon the investor to act for the corporation,

or if the investor is appointed as an executive officer.  Cf. Restatement (Second) of Agency at § 14C comment b.  The jury should be further instructed that the exercise of ordinary financial control over an investment does not give an investor the management of the company in which he or she invests.  An investor may, for example, impose conditions on the use of the money invested, such as targeting it for particular expenditures, without having the management of the company.  See generally Scott, 450 Mass. at 766.

3.  Conclusion.  For the foregoing reasons, we reverse the denial of the defendants' motion for judgment notwithstanding the verdict, and remand to the Superior Court for entry of judgment for the defendants.

So ordered.